# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JOHN E. OSBORNE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | **AND RECOMMENDATION** |
| MB-F, INC., | ) | |
| | ) | 1:08CV457 |
| Defendant. | ) | |

This matter is before the court on a motion for summary judgment by Defendant MB-F, Inc. (docket no. 19). Plaintiff John Osborne has responded to the motion. In this respect, the matter is ripe for disposition. Since there has been no consent to the jurisdiction of a magistrate judge, I must address the motion by way of a recommended disposition. For the following reasons, it will be recommended that the court grant Defendant's motion for summary judgment.

## BACKGROUND

Plaintiff was employed as a printing press operator for Defendant from February 15, 1995, to September 14, 2007, when his employment was terminated. Plaintiff was 58 years old at the time of his termination. On July 7, 2008, Plaintiff filed this lawsuit against Defendant, alleging that his employment was terminated because of his age in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.* ("ADEA").

**FACTS**[1]

Defendant's Business

Defendant MB-F is engaged in the dog show business, producing and managing more than 900 dog shows per year, from large shows such as Westminster Kennel Club to small events by local kennel clubs. (Joint Decl. ("JD") of Christiansen, Crowe, and Bingham, ¶¶ 4-6, attached as exhibit to docket no. 19.) Defendant's management assistance includes scheduling events and judges for the events, printing and mailing materials, participant registration, etc. (*Id.*)

Defendant's Print Shop

Defendant operates its own internal printing department to publish most of the material required for the dog shows, and most of the materials that Defendant regularly prints for each show includes (1) the "Premium List," which is a printed, public announcement of the dog show; (2) the "Judging Program," which provides the schedule of events to participants; and (3) the "Show Catalogue," which provides information about the dogs and their owners. (*Id.* ¶¶ 7-11.) Every year, Defendant prints more than 4 million copies of the various Lists and hundreds of thousands of copies of the various Programs. (*Id.* ¶¶ 9-10.) Defendant prints around 495 different Catalogues each year, requiring tens of millions of pages of printed material. (*Id.* ¶

---

[1] Rather than submitting a Statement of Facts in his brief opposing the motion for summary judgment, Plaintiff simply refers the court to the verified complaint and supporting affidavits. Therefore, the court has recited the Statement of Facts as presented in Defendant's brief. The court views the evidence in the light most favorable to Plaintiff on summary judgment, and the court will note where the facts are disputed.

11.) The print shop also prints numerous other materials for the dog shows, including event tickets, posters, envelopes, letterhead, etc. (*Id.* ¶ 8.)

Defendant is licensed by the American Kennel Club ("AKC") to produce the dog shows and must comply with its deadlines for mailing printed materials. (*Id.* ¶¶ 6, 13.) Occasional delays, combined with seasonal fluctuations in the number of shows, require flexibility in the shop to meet deadlines, as missed deadlines may result in reprimands, fines, or a license suspension by the AKC. (*Id.* ¶¶ 12-13.)

The Print Shop Machines

Defendant's print shop primarily operates four types of machines, including two types of presses. (*Id.* ¶ 14.) The two types of presses include two-color MOZP Heidelberg presses, known as the "large presses." (*Id.*) The print shop has three of these large presses. (*Id.*) The other type of press is a single-color GTO Heidelberg press, known as the "small press." (*Id.*) In addition, the print shop has one AB Dick envelope machine and one Kluge foil stamp/embosser machine. (*Id.*)

The three large presses generate at least 80 to 90 percent of all the printed materials produced in the print shop. (*Id.* ¶ 15.) The large presses print on paper big enough to provide sixteen pages of printed material. (*Id.*) The large presses can, in a single pass through the machine, print either two colors or one color on both sides of the page. (*Id.*) As such, the large presses print almost all the Lists, Programs, and pages for the Catalogues. (*Id.* ¶ 16.) A press operator can only run

-3-

Case 1:08-cv-00457-TDS-WWD   Document 36   Filed 09/17/09   Page 3 of 19

one press at a time, so there must be three capable press operators present for all three of the large presses to operate at the same time. (*Id.*)

The single, small press prints one color on smaller sheets of paper. (*Id.* ¶ 17.) The small press is not as efficient as the large presses for big printing jobs and, therefore, is rarely used to print a List or Program. (*Id.*) Instead, the small press is primarily used to print the covers for the Catalogues, tickets, armbands, and 12" and 19" posters. (*Id.*) The volume of material printed by the small press is only about 10 percent of the overall material published by the print shop. (*Id.*)

The third type of machine used in the print shop is the Kluge machine, which is primarily used to place a foil stamp and/or embossed texture on the Catalogue covers, and it may be used occasionally to foil stamp tickets or letterhead. (*Id.* ¶ 18.) The Kluge is used only 25 to 30 times per year and can sit unused for weeks at a time. (*Id.*) Finally, the AB Dick machine functions as a one-page duplicator, primarily used to print envelopes, show tickets, internal memorandum, and other miscellaneous, one-page print requirements. (*Id.* ¶ 19.)

<u>The Print Shop Employees and Plaintiff's Job as a Press Operator</u>

Before June 30, 2006, the print shop was staffed with four press operators: Harold Portis, age 66, Robert Reed, age 53, Hosein Forotan, age 54, and Plaintiff, age 57. (*Id.* ¶¶ 20, 23, 24.) Portis voluntarily retired on June 30, 2006, at age 66. (*Id.* ¶ 21.) When he retired, Portis could operate all four pieces of equipment within the shop, and the experience of the other three press operators was divided

between the machines. (*Id.* ¶¶ 21, 22.) Reed and Forotan had prior experience operating the small press, but could also operate and did operate the large presses after Portis retired. (*Id.* ¶¶ 23-24.) In contrast to Portis, Reed, and Forotan, Plaintiff never learned how to operate the large presses. (*Id.* ¶ 25.) Since his hire as a press operator on February 15, 1995, Plaintiff worked solely on the small press, the AB Dick machine, and occasionally on the Kluge machine. (*Id.*)

When Portis retired in June 2006, Defendant decided not to replace him in the print shop because printing volumes had decreased, and there was not enough work to justify four full-time press operators. (*Id.* ¶ 26.) With only three operators, however, there was a need for greater flexibility to run different machines, particularly all three of the large presses. (*Id.*) Unless Plaintiff learned to operate the large press, the three large presses could not be operated simultaneously, nor could two of the large presses be run if an operator other than Plaintiff was absent. (*Id.* ¶¶ 26-28.)

According to Defendant, management repeatedly instructed Plaintiff that he needed to learn how to run a large press. For instance, shortly before Portis retired, management met with Reed, Forotan, and Plaintiff. (*Id.* ¶ 27.) At that meeting, Defendant's President Bobby Christiansen, and Defendant's Vice-President and Human Resources Director Dorie Crowe told Reed, Forotan, and Plaintiff that Portis would not be replaced, and they further explained that the three remaining operators needed to learn how to operate all of the machines within the shop to make sure Defendant could meet its printing deadlines. (*Id.* ¶¶ 27-28.) During the meeting,

-5-

Crowe told Plaintiff that the change from four to three press operators meant he needed to learn to operate the large presses. (*Id.* ¶¶ 30.) Furthermore, Plant Manager Mark Bingham repeatedly encouraged Plaintiff to learn how to run the large presses from either Reed or Forotan. (*Id.* ¶ 31; Pl.'s Dep., pp. 37-38, 46.)

It is undisputed that Plaintiff did not learn how to operate the large presses in the year after Portis retired. Defendant maintains that although Plaintiff spent a few hours working with Reed on the large press when suggested, he never took the initiative to learn how to operate the large press. Defendant contends that Plaintiff had ample time in the shop to learn how to operate the large press, due to the lower volumes on the machines Plaintiff operated, as well as seasonal fluctuations in printing volumes. Defendant further notes that Plaintiff often worked shorter hours than the other press operators. (JD ¶¶ 32-34; *see also* Pl.'s Dep., pp. 42, 50-56, 59, Ex. #5.)

Significantly, Plaintiff disputes Defendant's contention that he was given enough time to learn how to operate the large presses. Plaintiff admits that supervisors told him he needed to learn how to operate the large presses, and that management encouraged all of the employees to cross-train on each type of equipment. Plaintiff contends, however, that there was not enough time for the employees to adequately cross-train and that Defendant did not take the time to give Plaintiff proper training on the large presses.

-6-

Reed's Resignation, Forotan's Hospitalization, and Plaintiff's Termination

In December 2006, Reed resigned, and Defendant then hired Sam Welborn, age 45, to replace Reed in the print shop. (JD ¶¶ 35-36.) Welborn had prior press experience and learned how to operate the large presses after he was hired. (*Id.* ¶ 36.) On May 29, 2007, Forotan was hospitalized and took an emergency medical leave of absence for almost a month. (*Id.* ¶ 37.) Forotan's absence left Welborn as the only press operator capable of running a large press. (*Id.* ¶ 38, Pl.'s Dep., pp. 40-42, 48.) The print shop quickly fell behind on its work with only one operator capable of running the large press, even though Welborn was working overtime. (JD ¶ 39.) Despite this growing problem, Plaintiff did not try to run a large press in Forotan's absence. (*Id.* ¶ 40.) In fact, according to Defendant, Plaintiff displayed no interest in running a large press, and he also expressed no concern over the increasing backlog created with only one large press operator. (*Id.*) Plaintiff admitted in his deposition that he did not even know if the print shop was falling behind during Forotan's absence, although he stated that he assumed that it did. (Pl.'s Dep., pp. 43-44, 48-49, 55.) He further admitted that he never spoke to Welborn or Bingham about the needs of the department in Forotan's absence or about the extra hours that Welborn was working. (*Id.*, pp. 43-44, 48-49, 55.)

Without assistance from Plaintiff on a large press, additional personnel were quickly needed to keep the shop from missing deadlines. (JD ¶ 41.) Bingham stepped in to run one of the large presses, but the work took him away from full-time

-7-

plant management responsibilities. (*Id.*) Any missed deadlines could have resulted in significant repercussions for Defendant–not only to its reputation, but also a reprimand, fine, or even a license suspension by the AKC. (*Id.* ¶¶ 41-42.) As a result of the back log and need for someone to operate the large presses, Christiansen instructed Bingham to incur the added expense of contracting with a staffing company for the services of a temporary press operator. (*Id.* ¶ 41.) On June 7, 2007, the staffing company provided Mike Johnson to work as a temporary press operator. (*Id.* ¶ 44.) Johnson had been employed by a commercial printing company and had substantial experience running a large, seven-color press, but was willing to work for Defendant as a temporary employee for the opportunity to work day shift hours. (*Id.*) In addition, Bingham contacted Portis, who had been retired for almost a year, and asked him to return for one week to provide assistance. (*Id.* ¶¶ 43-44.)

Defendant describes Johnson as a "hard worker," and states that after a few days of training, he could operate the large presses. (*Id.* ¶ 45.) In subsequent months, Johnson also learned how to operate the small press and the AB Dick duplicator. (*Id.*) With Johnson able to operate a large press, the print shop was able to avoid missing deadlines. (*Id.*) Furthermore, after Forotan returned to work on June 25, 2008, the print shop began to eliminate the back log of printing jobs created by his illness, and within a couple of months, there was no longer a need for four press operators working in the shop. (*Id.* ¶¶ 45-47; Pl.'s Dep., pp. 56, 60; Portis Dep., pp. 54-55, 67-68.)

-8-

Defendant states that Bingham approached executives Christiansen, Crowe, and Lyman to discuss which three press operators to retain, specifically, whether Defendant should retain Johnson and terminate Plaintiff's employment. (JD ¶ 48.) Bingham reasoned, and Christiansen, Crowe, and Lyman agreed that, with only three press operators in the print shop, the ability to run the large presses was the most important criterion for the job and that Johnson should be retained because of his demonstrated ability to operate the large presses. (*Id.* ¶ 49.) Furthermore, he had demonstrated his willingness to learn other equipment. (*Id.*) Defendant contends that, by contrast, Plaintiff had not made any significant efforts to learn the large presses during the year after Portis retired and, that despite the problems created during Forotan's absences, Plaintiff still did not know how to run the large presses. (*Id.* ¶ 49.) Defendant decided to retain Johnson, Forotan, and Welborn and terminated Plaintiff's employment on September 14, 2007. (*Id.* ¶¶ 52-53.)

**STANDARD OF REVIEW**

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting). When making the summary judgment determination, the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997).

**DISCUSSION**

As noted, Plaintiff brings a claim for age discrimination under the ADEA. *See* 29 U.S.C. § 623(a). To satisfy ordinary principles of proof in discrimination cases, a plaintiff must provide direct evidence of a purpose to discriminate or circumstantial evidence of sufficiently probative force to raise a genuine issue of material fact. *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988). Because it is often difficult for a plaintiff to provide direct evidence of discriminatory intent, the Supreme Court has created a burden-shifting structure for analyzing such claims. *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under this burden-shifting structure, known as the "McDonnell Douglas" framework, the plaintiff must first plead certain facts creating an inference of discrimination and referred to as the plaintiff's

prima facie case. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (assuming that the McDonnell Douglas framework was "fully applicable" in both Title VII and ADEA actions).

To establish a prima facie case of age discrimination under the McDonnell Douglas framework, Plaintiff must show that (1) he is a member of the protected class[2]; (2) when he was terminated, he was qualified for the job and performing at a level that met Defendant's legitimate expectations; (3) he was discharged despite his qualifications and performance; and (4) following his discharge, he was replaced by a substantially younger employee with comparable qualifications. *Martin v. Patrick Indus. Inc.*, 478 F. Supp. 2d 855, 859 (M.D.N.C. 2007); *Rishel v. Nationwide Mut. Ins. Co.*, 297 F. Supp. 2d 854, 869 (M.D.N.C. 2003).

Once a plaintiff establishes a prima facie case, the burden then shifts to the defendant to demonstrate a legitimate, nondiscriminatory reason for the challenged action; however, this burden "is one of production, not persuasion." *Reeves*, 530 U.S. at 142. If the employer demonstrates a legitimate, nondiscriminatory reason, the presumption of unlawful discrimination created by the prima facie case "drops out of the picture," and the burden shifts back to the employee to show that the given reason was merely a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55,

---

[2] For ADEA purposes, the protected class is comprised of individuals who are at least 40 years of age. *See* 29 U.S.C. § 631(a).

57-58 (4th Cir. 1995). The responsibility of proving that "the protected trait . . . actually motivated the employer's decision" remains with the plaintiff at all times. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Thus, it is not enough for a plaintiff merely to raise an inference of discrimination. Rather, a plaintiff bears the ultimate burden of proving that the decision was made not on any proffered grounds but instead on the basis of impermissible discriminatory grounds. *Reeves*, 530 U.S. at 143. To overcome a motion for summary judgment in such a case, a plaintiff must provide direct or circumstantial evidence "of sufficient probative force" to show a genuine issue of material fact exists as to this question. *Goldberg*, 836 F.2d at 848. Finally, I note that the Supreme Court has recently held that, with respect to age discrimination claims under the ADEA, a plaintiff must prove that age was the "but-for" cause of the adverse employment action; therefore, it is not enough for a plaintiff in an age discrimination case to show that age was merely a "motivating" factor in the decision. *See Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2352 (2009). With these principles in mind, the court now turns to Plaintiff's age discrimination claim.

Here, it is undisputed that Plaintiff has no direct evidence of age discrimination; therefore, he must proceed under the McDonnell Douglas burden-shifting scheme. Plaintiff clearly meets the first prong of the prima facie case–he was 58 when his employment was terminated, and he was therefore a member of

-12-

Case 1:08-cv-00457-TDS-WWD   Document 36   Filed 09/17/09   Page 12 of 19

the protected class. Furthermore, Plaintiff has shown that he was replaced by a substantially younger employee, Michael Johnson, who was 38 when he began working for Defendant. The central dispute between the parties is over whether, when Plaintiff was terminated, he was performing at a level that met Defendant's legitimate expectations. Defendant contends that Plaintiff was not meeting Defendant's expectations when he was fired in that Defendant had repeatedly encouraged him to learn how to operate the large presses, and he never took the initiative to do so. Defendant contends that the undisputed facts are that Defendant told Plaintiff on numerous occasions over the years that he needed to learn how to operate the large presses. (Pl.'s Aff. ¶ 2; JD ¶¶ 27, 29-31; Pl.'s Dep., pp. 37-46.) More specifically, Defendant requested that Plaintiff and the other press operators cross-train on other pieces of equipment after Portis retired. (JD ¶¶ 26-27.) Defendant contends that, in this regard, Plaintiff was not treated any differently from the other press operators because of his age.

In response, Plaintiff contends that he was meeting Defendant's legitimate expectations when he was fired, as documented by his 12 years of service with Defendant, the lack of any negative documentation about his performance in his employment record, and the statement in Portis's affidavit that Plaintiff was performing according to Defendant's legitimate expectations when Plaintiff was fired. Plaintiff contends that he simply was not given sufficient time or opportunities to train on the large presses. (*See* Pl.'s Aff. ¶¶ 4, 10.) Plaintiff contends that, by contrast,

-13-

younger workers such as Welborn and Johnson were sufficiently trained on how to operate the large presses. (*Id.* ¶¶ 11, 12.) As for Defendant's contention that the employees all had the opportunities to "cross-train" on different types of equipment, Plaintiff contends that this cross-training never happened, and that this is documented by the fact that Reed, Forotan, Welborn, and Johnson could not operate the GTO Heidelberg, the AB Dick, or the Kluge at the time Plaintiff was terminated. (*See* Portis Aff.)

In opposing the summary judgment motion, Plaintiff offers the affidavits of Portis, who retired on June 30, 2006, and a Letter Declaration of Reed, who resigned in December 2006. In Portis's affidavit, Portis states that Plaintiff was performing in a fully satisfactory manner when he was terminated, and that Plaintiff was not given an adequate amount of time to learn how to operate the large presses. (Portis Aff. ¶¶ 3, 6, 10, 15.) Portis asserts that, by contrast, Johnson received proper training on how to operate the large presses. (*Id.* ¶¶ 4, 10.) Portis states that proper training on the large presses takes about three straight days, and that Plaintiff could have learned how to operate the large presses if he had been given the opportunity to learn how to operate them, but that Defendant's management never set aside enough time for press operators to cross-train on other machines. (*Id.* ¶¶ 3, 4, 14.) In the Letter Declaration of Reed, Reed states that before he left the company in December 2006, the idea of cross-training on machines had come up as a "good idea," but that when the employees tried to do

-14-

it "something always came up." (Reed Decl., p. 1.) Reed further states that Plaintiff was always willing to help "in any way" and Plaintiff would have been capable of running the machines if he "had [been] given the chance to do that." (*Id.*)

In sum, Plaintiff contends that

> as between Plaintiff's age and Defendant's explanation, age was the more likely reason for the dismissal and that Defendant's rational [sic] is unworthy of credence, in light of the fact that younger press operators receive[d] proper training, Plaintiff's fully satisfactory history of performance for over twelve (12) years, no written documentation prior to Plaintiff's termination concerning the operation of the large press, and Plaintiff's supervisor stating that Plaintiff performed in a fully satisfactory manner and had comparable qualifications to the younger employees subsequently hired in order to perform Plaintiff's job duties and job functions.

(Pl.'s Br., p. 5.)

I note that Defendant first contends that the opinions of Portis and Reed regarding Plaintiff's job performance when he was fired are irrelevant because neither Reed nor Portis was Plaintiff's supervisor at the time of his termination. Defendant further notes that neither Portis nor Reed was employed by Defendant when Plaintiff was terminated in September 2007; Reed conceded he had no knowledge of anything that happened at work after December 2006; and Portis retired in June 2006, and returned to work for only a week in June 2007. I agree with Defendant that the opinions of Portis and Reed are irrelevant as to whether Plaintiff was meeting Defendant's job expectations when he was fired since neither of these men was employed with Defendant past 2006, nor were they decision makers in determining whether to terminate Plaintiff's employment. *See Hawkins*

-15-

*v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) (characterizing as "close to irrelevant" the opinions of co-workers regarding the plaintiff's job performance). Furthermore, Portis and Reed's opinions are only relevant and admissible as to those events that occurred while they were still working for Defendant and were within their personal knowledge. For instance, Portis cannot competently testify as to whether Defendant told Plaintiff that he needed to train on the large presses or whether Defendant gave Plaintiff a sufficient opportunity to learn how to use the large press after Portis's retirement date since Portis was no longer working in the print shop, except for the one week that he returned while Forotan was out on sick leave.

I find that the court should grant summary judgment to Defendant because Plaintiff has not set forth a prima facie case of discrimination. That is, Defendant has shown that the three large presses in the print shop produce greater than 80 percent of the printed material for Defendant, and all three of the large presses need to be in operation at the same time for Defendant to keep up with its printing demands. Because of this, Defendant told Plaintiff on many occasions that he needed to train on the large presses. (Pl.'s Aff. ¶ 2; JD ¶¶ 27, 29-31; Pl.'s Dep., pp. 37-46.) Plaintiff has admitted that he was told on many occasions after Portis retired that he needed to learn how to operate the large presses. (Pl.'s Aff. ¶ 2; JD ¶¶ 2, 4, 27, 29-31; Pl.'s Dep., pp. 37, 46.) Plaintiff has further admitted that in the year after Portis retired, Plaintiff did actually train on the large presses with Robert Reed assisting him. (Pl.'s

-16-

Aff. ¶ 3.) Finally, Plaintiff admitted in his deposition that his inability to run the large presses was the "but-for" cause of his termination. (Pl.'s Dep., pp. 61-62.) In sum, I find that at the time of his firing, Plaintiff was not meeting Defendant's legitimate expectations in that he had not learned how to operate the large presses, despite Defendant's repeated instructions for him to do so.[3]

Even assuming that Plaintiff could meet the prima facie case, Defendant has met the resulting burden of production by stating a legitimate reason for why it terminated Plaintiff's employment. Defendant has stated that it fired Plaintiff because he simply could not operate the large presses and that it retained Johnson, Welborn, and Forotan so that it would have three employees who could run the three large presses simultaneously.[4] Defendant explains that if it had retained Plaintiff and terminated Johnson, or retained Johnson and terminated Forotan or Welborn, then Defendant would have been faced with the immediate prospect of having only two operators capable of running the large presses. By doing so, Defendant would

---

[3] As Defendant notes, Johnson learned how to operate the large presses in just three days of training. By contrast, Plaintiff had more than a year after Portis retired in which he could have taken the initiative to learn how to operate the large presses, but he failed to take this initiative.

[4] Defendant also states that it decided to retain Forotan, Welborn, and Johnson for another reason. Defendant explains that because Forotan and Welborn knew how to run the larger two-color presses, Defendant was confident that all three could transition to run the small press, as well as the AB Dick machine. Defendant also notes that because Defendant does not need to operate the Kluge as often as the large presses, it was not as important to retain Plaintiff (who knew how to operate the Kluge), and that Defendant was confident that it could train the remaining operators to run the Kluge. (*See* JD ¶ 51.)

Case 1:08-cv-00457-TDS-WWD   Document 36   Filed 09/17/09   Page 17 of 19

expose itself to the same risk of missing printing deadlines that it had faced when Forotan was out on sick leave. (JD ¶ 50.)

Plaintiff has presented no evidence, other than Johnson's younger age, in his effort to show that Defendant's stated reason for terminating Plaintiff was merely pretextual and that Defendant really fired him because of his age. For instance, Plaintiff has submitted no evidence showing that Defendant intentionally interfered with Plaintiff's attempts to learn how to operate the large presses for the purpose of having an excuse to fire him, when the real reason was his age. Although Plaintiff contends that he was never given enough time to train because management would always make him leave the training to run a job on one of his presses, Plaintiff has produced no evidence whatsoever of any nefarious intent on management's behalf to intentionally prevent him from learning how to operate the large presses. It is undisputed that Plaintiff's inability to operate the large presses placed Defendant at a significant business risk when Forotan went out on a leave of absence in June 2007. (JD ¶¶ 41-42.) It is further undisputed that Defendant only hired Johnson and briefly brought back Portis because Plaintiff was unable to operate the large presses while Forotan was out sick. (*Id.* ¶¶ 35-38, 43-44.)

As Defendant notes, no reasonable jury could conclude that Defendant, contrary to its own business interests and its repeated instructions to Plaintiff that he needed to learn to operate the large presses, would purposely engage in a scheme to interfere with Plaintiff's training, or refuse to train Plaintiff on the large presses

simply because it wanted to terminate Plaintiff's employment because of his age. Moreover, as Defendant notes, Defendant initially hired Johnson on a temporary basis when Forotan went on leave so that Defendant would have someone to operate the large presses since Plaintiff had not learned how to do so. Defendant only later made the decision to hire Johnson permanently and not to retain Plaintiff since he was the only press operator who could not run the large presses. In sum, there is no reasonable basis for a jury to conclude that Defendant intentionally discriminated against Plaintiff and that "but for" Plaintiff's age he would not have been terminated.

**CONCLUSION**

For the reasons stated herein, it is **RECOMMENDED** that the court **GRANT** Defendant's motion for summary judgment (docket no. 19) and dismiss Plaintiff's action in its entirety.

_____
WALLACE W. DIXON
United States Magistrate Judge

September 17, 2009